*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-0849

T.W.,* APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2018-CF2-003695)

(Hon. Todd E. Edelman, Trial Judge)

(Argued April 6, 2022                    Decided April 20, 2023)

*KC Bridges*, Public Defender Service, with whom *Samia Fam* and *Alice Wang*, Public Defender Service, were on the brief, for appellant.

*David P. Saybolt*, Assistant United States Attorney, with whom *Channing D. Phillips*, Acting United States Attorney at the time, *Chrisellen R. Kolb*, *John P. Mannarino*, and *Jamie Carter*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY and DEAHL, *Associate Judges*, and THOMPSON, *Senior Judge*.

---

* Appellant has moved that we refer to him by his initials only given that he was sentenced under the Youth Rehabilitation Act and is eligible to have his arrest records expunged. The United States indicated that it opposes the motion, but did not file a written opposition or otherwise offer any reasons for its position. The division has granted appellant's motion.

Opinion of the court by *Associate Judge* DEAHL.

Dissenting opinion by *Senior Judge* THOMPSON at page 34.

DEAHL, *Associate Judge*:  T.W. appeals his convictions for carrying a pistol without a license and other gun-related charges, stemming from police officers finding a loaded firearm on him after T.W. consented to a pat-down search.  T.W. argues that the trial court should have granted his motion to suppress that firearm because it was the fruit of an unlawful seizure in violation of the Fourth Amendment. The government concedes that, if officers did in fact seize T.W. before he consented to a pat-down search, the seizure was unlawful, the motion to suppress should have been granted, and we must reverse T.W.'s convictions.  It contends only that T.W. was not in fact seized when he consented to a search.

We agree with T.W. that he was unlawfully seized in violation of the Fourth Amendment before he consented to the search, and therefore reverse his convictions.

**I.**

The relevant facts are largely undisputed and were captured by body-worn camera footage submitted at the suppression hearing.  Officers Dmitry Gendelman and Krishaon Ewing of the Metropolitan Police Department were patrolling in the

Woodland neighborhood of Southeast, D.C., at around 5:30 p.m. one March evening. Both officers were part of an MPD "crime suppression team," which proactively patrols high-crime areas for guns, drugs, and other illegal activity. The officers were armed and in full police uniform, with Gendelman wearing a bulletproof vest "with big white letters that say 'Police' . . . on the front." They rode as passengers in a marked police vehicle, and another marked police vehicle followed closely behind.

As they approached an apartment building at 2348 Ainger Place SE, Gendelman saw somebody, later identified as T.W., "pop out" of a side alley connecting the apartment building's parking lot to the street. T.W. seemed to notice the approaching police vehicles before he walked back into the alley toward the apartment building's nearby entrance. Gendelman found T.W.'s conduct suspicious, and the vehicle's driver sped up and then turned into the alley after T.W. As the officers pulled up, T.W. was in front of the steps leading to the apartment building's entrance, set back several feet from the alley.

The first police vehicle went just past T.W. and came to a stop, with T.W. several feet from the car's rear passenger's side. Gendelman and Ewing, whose hand was on the car door's handle as the car pulled up, quickly exited the car the moment it stopped. Ewing exited from the front passenger's seat and approached T.W. from

his right, while Gendelman exited the rear driver's side door and walked around the back of the vehicle, so that he approached T.W. from his left side. At that same time, a second police vehicle pulled into the alley, and at least two officers began exiting that vehicle, too, as Gendelman and Ewing started questioning T.W.

T.W. raised his hands in the air upon seeing the two officers exit the front vehicle. Ewing asked T.W. whether he had a gun on him, and T.W. responded no. Ewing and Gendelman continued approaching T.W. from each side, and Ewing asked "You sure?" to which T.W. replied, "Yeah, I'm positive." Gendelman then asked, "I can pat you down just to make sure?"[1] T.W. said "Yeah," and Gendelman responded, "My man," as he began to pat T.W. down. Gendelman found a gun in T.W.'s waistband. The encounter lasted about ten seconds from when the first officers exited their vehicle to when the pat-down search began, and it took just about another five seconds for the officers to find the gun on T.W. He was charged

---

[1] The trial court recounted this as "Can I pat you down just to make sure," and the parties do likewise in their briefs. The body-worn camera footage is clear, however, that this statement, while inflected as a question, was phrased as a declaration—"I can pat you down just to make sure?" While that is a subtle discrepancy, we rely on the statement as clearly reflected in the video footage. *See Henderson v. United States*, 276 A.3d 484, 489 (D.C. 2022) (applying clear error standard "to the trial court's factual determinations" regarding its "evaluation of the body-worn camera footage").

with carrying a pistol without a license, possession of an unregistered firearm, unlawful possession of ammunition, and possession of a large-capacity ammunition-feeding device.[2]

Before trial, T.W. moved to suppress the gun, its magazine, and its ammunition. He argued that he was unlawfully seized in violation of the Fourth Amendment when he consented to a pat-down search, and that his consent was the fruit of the illegal seizure. During a hearing on his motion to suppress, T.W. testified that he was "scared and nervous," never having been arrested before, and did not think he could say "no" to Gendelman's pat-down request. Asked why not, T.W. responded, "Because of how they came up on me. I felt like I couldn't walk away." T.W. further highlighted his youth (21 years old at the time), his "complete lack of experience" with police, "and the fact that he was confronted by multiple officers" who "essentially jumped out on [him] and immediately began asking accusatory questions."

---

[2] D.C. Code §§ 22-4504(a) (carrying pistol without license), 7-2502.01(a) (possession of unregistered firearm), 7-2506.01(a)(3) (unlawful possession of ammunition), 7-2506.01(b) (possession of large-capacity ammunition-feeding device). T.W.'s gun had an extended magazine with 28 rounds of ammunition, the capacity to hold two additional rounds, plus the gun itself had one round in the chamber.

The trial court denied the suppression motion after concluding that T.W. was not seized before consenting to a search. The court stressed that the officers' tone when they engaged T.W. was "conversational," and that the officers were not positioned "such that [T.W.] could not have physically walked away down the street or back into the building." After the trial court denied T.W.'s suppression motion, the parties agreed to a stipulated bench trial in which T.W. effectively admitted to the elements of each offense while preserving his right to appeal the suppression ruling. The trial court sentenced T.W. under the District's Youth Rehabilitation Act to an aggregate sentence of six months' incarceration, suspended in its entirety, and one year of supervised probation. T.W. now appeals.

## II.

The dispositive question in this appeal is whether T.W. was seized when he agreed to Gendelman's request to pat him down.[3] The government does not contend that officers had a lawful basis for seizing T.W. before discovering the gun in his

---

[3] T.W. also argues on appeal that even if he was not seized, he did not voluntarily consent to a search and, even if he did, the officer's search exceeded the scope of any consent. Because we conclude the seizure question is dispositive, we need not address T.W.'s arguments related to consent.

waistband.[4] *See generally Terry v. Ohio*, 392 U.S. 1 (1968). The government further concedes that, if T.W. was seized when he consented to a search, his consent was the fruit of that seizure and of no legal effect because there was "no break in the causal chain" sufficient to "purge the primary taint of the unlawful seizure." *Jones v. United States*, 154 A.3d 591, 598 & n.20 (D.C. 2017) (citations omitted).

Whether a person has been seized "is a question of law which this court reviews de novo, deferring to the trial court's factual findings, unless clearly erroneous." *Dozier v. United States*, 220 A.3d 933, 940 (D.C. 2019) (quoting *Jackson v. United States*, 805 A.2d 979, 985 (D.C. 2002)).

### A. Background Principles of Fourth Amendment Seizures

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. While there is invariably some inherent pressure to cooperate with police officers, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v.*

---

[4] Gendelman testified that T.W. did not act in a manner that would suggest he was carrying a firearm. He was not "[b]lading [his] body away" from officers or keeping an "[a]rm against [his] side," for instance. Gendelman also acknowledged he did not see any bulge in T.W.'s clothing suggestive of a firearm.

*Bostick*, 501 U.S. 429, 434 (1991). Instead, the Fourth Amendment "tolerates a measure of official pressure in exchange for needed cooperation from the public" in assisting law enforcement. *Dozier*, 220 A.3d at 943. A person can be seized in the absence of any physical restraints, however, so long as the surrounding circumstances would lead a reasonable person to believe they are not free to unilaterally terminate the encounter with officers and go about their business. *Jones*, 154 A.3d at 598.

The crucial test in deciding whether a person has been seized is whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Immigr. & Naturalization Serv. v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)). The reasonable person under that test is the reasonable innocent person, not a guilty person whose criminal conduct might give them added reason to believe they had been caught and thus could not walk away. *Bostick*, 501 U.S. at 438. If consent to a search is "given contemporaneously with the illegal seizure, with no break in the causal chain, the actions of the person seized are not free from the taint of unlawful detention and are thus insufficient to show consent." *Dozier*, 220 A.3d at 940 (quoting *Jones*, 154 A.3d at 598 n.20).

Circumstances that might signify a seizure include the "presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554 (opinion of Stewart, J.). To that list, we have added factors such as whether (1) the individual "is by himself" in the area so that the police presence was apparently focused exclusively on him, *see Jones*, 154 A.3d at 596; (2) the encounter is in a place "that is secluded or out of public sight," *id.*; (3) the officers are uniformed or have their weapons visible, *see id.* at 595; (4) the officers have blocked the individual's potential exit paths or "means of egress," *Golden v. United States*, 248 A.3d 925, 939 (D.C. 2021) (citation omitted); (5) the officers' questions are "accusatory," *id.* at 935; and (6) the officers repeat accusatory questions in the face of an initial denial, signaling that they have "refused to accept" the answer given, *id.* at 938. Conversely, an encounter's "brevity" and the officers' "cordiality" during it are factors that often weigh against finding a seizure. *Jones*, 154 A.3d at 598.

## B. T.W. Was Seized Under the Fourth Amendment

T.W. argues that he was seized before he consented to a search. We agree. A host of factors contribute to our conclusion: (1) T.W. was the only person in the area;

(2) two marked police vehicles, with at least three armed and uniformed officers in each, quickly pulled into an alley after T.W.; (3) the officers positioned their vehicles in a manner that boxed T.W. in, cutting off his two most obvious escape paths and signaling that he was not free to leave; (4) the two officers who exited the front vehicle approached T.W. from both sides, further obstructing his potential exits, a third officer had exited the rear vehicle, and a fourth had their door open (though it is unclear from the video footage if they had fully exited the car at the time T.W. consented to a search), so that four officers were approaching T.W. before T.W. agreed to be searched; (5) the officers asked T.W. only accusatory questions, all suggesting they believed he had a gun on him; and (6) although T.W. twice denied having a gun, the officers did not accept his answer and instead asked if they could search him "just to make sure," manifesting their disbelief in T.W. and suggesting they were not going to let him walk away unless he could alleviate those suspicions. Those various factors can be sorted into two broader categories: (1) the officers' approach and (2) the officers' questioning, which we now address in turn.

First, as to the officers' approach of T.W., this encounter "commenced with an impressive show of police authority." *Golden*, 248 A.3d at 936. This was not an officer (or two) on foot patrol who happened to engage a passerby in conversation. This was at least six officers in two marked police vehicles, and they did not just

happen upon T.W.; they hurriedly followed him into an alley where nobody else was around with a clear purpose to confront him. The officers stopped their cars abruptly—one just in front of T.W., and one just behind him—and two officers immediately exited the front vehicle, a third had exited the rear vehicle, and a fourth at least had their door open before any consent to a search. Each of these factors contributes to our conclusion that a person in T.W.'s shoes would not have felt free to leave. *See Dozier*, 220 A.3d at 942 (police encounter is "more intimidating if the person is by himself, if more than one officer is present, or if the encounter occurs in a location that is secluded or out of public sight") (quoting *Jones*, 154 A.3d at 596). The officers also boxed T.W. in, both in how they positioned their cars and in how they approached him on foot from both sides. *See Golden*, 248 A.3d at 940 (noting that patrol cars had parked perpendicular to each other, "directly in front of and beside" Golden, giving police "control" over his movement). T.W.'s immediate reaction to the officers' approach—freezing and raising his hands in the air—was a natural response to this show of authority.[5] *Id.* at 936 ("[I]t is telling that [the

---

[5] Our dissenting colleague contends otherwise, positing that a reasonable person in T.W.'s shoes would have thought the police vehicles that sandwiched him in were "look[ing] for someone inside the apartment building," so T.W. raising his hands is better seen as "consciousness of guilt" evidence. We disagree. Raising one's hands is an eminently sensible thing for anybody to do when swarmed by police officers in this manner, particularly a young black man in a heavily patrolled area. *Dozier*, 220 A.3d at 944 ("[A]n African-American man facing armed policemen would reasonably be especially apprehensive."). That is no doubt why

defendant] 'froze' and appeared nervous."). The officers' approach signaled that they suspected T.W. of criminal activity (as they did) and that they would detain him unless disabused of their suspicions.

Second, the officers' questioning would have further indicated to a reasonable person in T.W.'s shoes that they were not free to leave. The first thing the officers said to T.W. when they exited their vehicles was to ask whether he had a gun. This question gave T.W. "reason to understand that a group of police officers . . . had singled him out and partially surrounded him because they suspected *him* of being armed and committing a crime at that very moment." *Id.* at 937. Asking whether someone has a gun is not "equivalent to a simple request for information that an officer might put to an ordinary civilian who is not a suspect." *Id.* And after T.W. answered with a "no," Ewing again asked T.W., "You sure?"—a question conveying that the officers were not satisfied by his denials. Such repeated "questions or requests designed to ferret out whether someone stopped on the street is in possession of weapons or contraband . . . can create a powerful impression to any reasonable person that the police will not allow the suspect to terminate the inquiry and depart before satisfying the officers' concerns." *Id.* at 935-36. Still, T.W.

---

neither the government nor the officers have ever suggested they believed T.W.'s raised hands evinced a guilty conscience.

responded that he was "positive" he did not have a gun. Despite those repeated denials, the officers still indicated they did not believe him when Gendelman asked to pat him down "just to make sure." When police "persist in suspecting [a] person of carrying a firearm despite the person's denial," a reasonable person "would not feel free to frustrate the police inquiry." *Id.* at 937.

Those factors bring this case into close alignment with our recent decision in *Golden*, which this court decided after the trial court issued its ruling denying T.W.'s suppression motion. T.W. contends that *Golden* cannot be meaningfully distinguished from this case. We agree. What few distinctions there are between this case and *Golden* largely cut in T.W.'s favor, as we view the circumstances here as being at least as coercive as those in *Golden*. T.W. also highlights another recent case of this court, *Dozier*, which likewise provides strong support for T.W.'s argument. The government, for its part, points to a handful of cases that it argues involved more intrusive police tactics yet were upheld against Fourth Amendment challenges, though we disagree with its description of those cases. We consider *Golden*, *Dozier*, and the government's contrary authorities in turn below.

*1. Golden v. United States*

In *Golden*, the defendant was walking alone at night when he was approached by four officers in two patrol cars. 248 A.3d at 931. One car stopped ten to twenty feet in front of Golden, and the other pulled up on the perpendicular street, about seventeen feet to Golden's left. *Id.* All of the officers remained seated in their vehicles with their windows rolled down. *Id.* at 932. One of the officers asked Golden if he had any weapons on him. *Id.* Golden said he did not. *Id.* The officer responded, "Can you just show me your waistband?"—and it was at that point that we determined that Golden had been seized. *Id.* (alterations omitted). "This took the encounter beyond mere questioning," as this request "implied the police would view Mr. Golden with heightened suspicion if he attempted to end the encounter without first exposing his waist." *Id.* at 937. Under those circumstances, we reasoned, a reasonable person would think that refusing the officers' request would confirm their evident suspicions and "only prolong their interference with the suspect's liberty." *Id. Golden* compels the same result here. The government offers four counterpoints in an effort to distinguish *Golden*, but none of the distinctions work in its favor.

First, the government stresses that after Golden initially denied having a gun, officers asked him three times to prove his assertion by showing them his waistband. *Id.* at 932. That is true as a factual matter, but we did not attach any legal significance to the fact that those requests were repeated. Rather, we concluded that the encounter turned into a seizure upon the officer's *first* request to see Golden's waistband—"Can you show me your waistband?"—because under the circumstances, that indicated the officers would not take his initial denial at face value. *Id.* at 937 (initial request "took the encounter beyond mere questioning"); *id.* at 938 ("[T]he encounter attained the level of a Fourth Amendment seizure when the police officer called upon the suspect to expose his waistband" and Golden "acquiesced."). The same is true here; "Can you show me your waistband" is no more a command than the "I can pat you down just to be sure" that we have here. Our dissenting colleague makes this same misstep when she tries to distinguish *Golden* based on "repeated commands" that Golden show his waistband, despite the clear immateriality of the repetition to our holding in *Golden*. The more pertinent distinction is that T.W. twice denied having a gun before being asked to submit to a search, whereas Golden only denied having a gun once, a point which cuts in favor of finding that T.W. was seized.

Second, the government argues that Golden was asked to subject himself to a "[h]umiliating" "public unveiling of part of his body," *id.*, and that T.W.'s pat-down search was "less intrusive" than that. Quite the opposite. As the Supreme Court put it more than fifty years ago, a pat-down search "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment." *Terry*, 392 U.S. at 17. It is "simply fantastic" to suggest that it is a "petty indignity." *Id.* at 16-17; *see also Bond v. United States*, 529 U.S. 334, 337 (2000) ("Physically invasive inspection is simply more intrusive than purely visual inspection."). During a typical pat-down search, an officer will probe "every portion of the prisoner's body. A thorough search must be made of the prisoner's arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet." *Terry*, 392 U.S. at 17 n.13 (citation omitted). An officer's hands-on search is at least as intrusive as lifting one's own shirt to reveal one's waistband. Once again, any distinction on this point cuts in favor of T.W. having been seized, as he was asked to subject himself to what is generally the more intrusive of the two search procedures.

Third, the government stresses that Golden was "confronted by four officers" who "blocked his path," whereas T.W. was approached by only two officers. That's wrong. In *Golden*, there were a total of four officers in two police vehicles, none of

whom exited their vehicles and only one of whom had spoken to Golden at the point when he was seized. Here, if we are to simply count the officers in the police vehicles (as the government does for *Golden*), then at least six officers in two vehicles confronted T.W.[6] Four officers were approaching T.W., with three of them fully out of their vehicles and two of them within arm's reach of T.W. and actively questioning him at the time he claims he was seized. Once again, if there is a meaningful distinction between the two cases, it cuts decidedly in T.W.'s favor. There were six total officers in the vehicles compared to just four in *Golden*. At least three of the officers were out of their cars and approaching T.W., compared to none in *Golden*. Two officers were within arm's reach of T.W., compared to none in *Golden*. Two of the officers had questioned T.W., whereas only one did in *Golden*. No matter how you count the officers, the physical show of force was substantially higher here than in *Golden*.

Fourth, while the government argues that the officers here did not block T.W.'s exit paths, that is inconsistent with the evidence. The first patrol car parked

---

[6] T.W. asserts that there were seven officers in the two cars, but the testimony he relies upon for that assertion seems to be about the number of officers on the scene after T.W. was found to have a gun, some of whom were not in the first two vehicles to arrive. Suffice it to say that it is evident from the body-worn camera footage that at least six officers were in those first two cars.

just a few feet in front of T.W., a bit closer than the vehicles that approached Golden, and the trailing vehicle parked behind T.W., so that the officers had him pinned in. The officers in the front vehicle then approached T.W. quickly from both sides in a pincer maneuver, with one approaching from his right and the other circling around the back of the vehicle to approach T.W. from his left. There was conceivably one exit still available to T.W. that did not go through an approaching officer—he might have gone inside the apartment building, presuming the door was unlocked—but that is largely beside the point. The relevant question is not whether there was some conceivable exit path available to T.W. (though a complete lack of exits would make a seizure even more likely). It is instead whether T.W. would have reasonably understood the officers to be blocking his exits, not whether they were perfectly effective in doing so. *Golden*, 248 A.3d at 940 (acknowledging that officers "did not physically and totally 'block' Mr. Golden's movement, [but] they at least 'control[led]' it by parking directly in front of and beside him, in two perpendicular sides of a box"); *id.* at 939 (citing favorably a case which held there was a seizure where officers "blocked all but one means of egress").[7]

---

[7] Two additional points of contrast between this case and *Golden* cut marginally in opposite directions. Here, nobody else was in the area, whereas in *Golden*, there were other "people seen standing around in the vicinity." 248 A.3d at 936; *see Jones*, 154 A.3d at 596 ("The circumstances are more intimidating if the person is by himself . . . ."). That cuts in favor of finding this encounter more coercive than the one in *Golden*. On the other hand, the encounter in *Golden* was at

The dissent posits two additional bases to distinguish *Golden* as "non-analogous in significant ways," *post* at 55, but the asserted distinctions are no distinctions at all, nor would they be of any significance even if they were.

First, the dissent asserts that, unlike in *Golden*, the officers here did not "park their vehicles in a way that would have conveyed to a reasonable innocent person that he was a target of investigation." That is a surprising view given that the officers here sped into the alley where T.W. was the only person present and parked their vehicles mere feet from and on both sides of him. But even if one adhered to the dissent's view about what the parking formation would have conveyed to a person in T.W.'s shoes, the dissent ignores the far more potent distinction: the officers remained in their cars in *Golden*, whereas here they exited their cars and walked right toward T.W. If the manner in which they parked their police cruisers left any room to doubt that T.W. was the target of their investigation, their subsequent direct approach of T.W. could not possibly have, so this attempt to distinguish *Golden* falls flat.

---

night, whereas here it was still daylight out, a point which tends to increase the coercion evident in *Golden* as compared to here. *Id.* at 938, 945 (noting that the encounter was at night).

Second, the dissent stresses that there was a "grassy walkway," which it sometimes refers to as a "pedestrian pathway," between the traffic bollards and the apartment building that provided T.W. a potential path of egress. To be clear, this is not a walkway in any ordinary sense; it is a narrow strip of dirt and grass between the asphalt and the apartment building, with the bollards performing their typical function of preventing cars from running into the building, not demarcating a pedestrian walkway. It is a walkway only in the sense that one could walk along it, just as one might walk along a window ledge, but even if it were a more conventional walkway that would not distinguish *Golden* either. Golden was on a sidewalk walking toward a major intersection when two police vehicles parked perpendicularly by the intersection's curb, forming "two perpendicular sides of a box." 248 A.3d at 940. Nothing physically impeded Golden from continuing along the sidewalk, or turning around on it, which is of course a far more natural "pedestrian pathway" than the narrow patch that the dissent attaches so much significance to.[8] It simply did not matter to our analysis in *Golden* that the officers

---

[8] "Golden was walking . . . down Southern Avenue and approaching the intersection with South Capitol Street" when the officers "pulled up to the curb" near him. 248 A.3d at 931. While the opinion does not specify that Golden was on the sidewalk, that is fairly obvious from the context, and the briefing makes clear that he was. *See, e.g.*, Brief for the United States, 2019 WL 12379403 (Feb. 7, 2019) (Golden "was in the sidewalk area at that time. Nothing impeded [his] movement to the right or left, or behind him.").

"did not physically and totally 'block' Mr. Golden's movement," *id.*, and it likewise does not matter here.

## 2. United States v. Dozier

T.W. also asserts that *Dozier*, another opinion our court issued after the trial court's ruling, compels the conclusion that he was seized. We agree that *Dozier* also counsels in favor of concluding that T.W. was seized.

In *Dozier*, two officers followed the defendant by foot down an alleyway at night, as two other officers remained seated in a nearby patrol car with illuminated blue lights. 220 A.3d at 937-38. One of the officers asked Dozier, "Hey, man, can I talk to you?" *Id.* Dozier did not respond and continued walking. *Id.* The officer asked again if he could talk to Dozier, who then stopped and said he could. *Id.* The officer asked whether he had "any illegal weapons on him." *Id.* Dozier said he did not and lifted his jacket to show there was nothing in his waistband. *Id.* The officer asked if he could pat him down "for any weapons," and Dozier replied, "yes, you can check me." At that point the officer asked Dozier "to place his hands on the [alley] wall," and Dozier complied. *Id.* We concluded "there was a Fourth Amendment seizure by the time [Dozier] submitted to the officers' request to a pat-down." *Id.* at 941. In concluding that Dozier was seized at that point, we noted that

while "the officers made 'requests' and did so in conversational tones, without orders, shouting, or threats," their actions nonetheless conveyed that Dozier was not free to decline their requests or terminate the encounter. *Id.* at 946-47. So too here.[9]

The government counters by pointing out that Dozier had been asked five questions before submitting to a search, compared to only three here. That is some difference between the cases, to be sure, but it is not an important one. There were two prefatory questions in *Dozier*—the repeated "hey, man, can I talk to you?"— that did not add much to the coercion calculus, and we gave little consideration to those questions in finding that Dozier had been seized. Far more important was the accusatory questioning, asking Dozier whether he had "any illegal weapons on him," followed up with a request to conduct a pat-down search when he denied having anything (just like here). And to the extent the two additional prefatory questions in *Dozier* made the questioning in that case slightly more coercive, that extra coercion is more than offset by the additional show of authority that the officers made here when approaching T.W. Again, there were six officers in two police cruisers on the

---

[9] In *Dozier*, we attached some significance to the fact that the defendant was a black man in a heavily patrolled high-crime area, which we explained might heighten the inherent coerciveness of an encounter with police officers. 220 A.3d at 943-45. T.W., too, is a black man who was in a high-crime area, though we do not find it necessary to take that factor into account in concluding that he was seized.

scene here, as opposed to four officers in just one car in *Dozier*. And four officers immediately began exiting their vehicles here, as compared to just two in *Dozier*. In any event, this is not a formalistic numbers-matching game—X number of questions by Y number of officers is unconstitutional—but a totality-of-circumstances inquiry.

Finally, the dissent tries to distinguish *Dozier* on the basis that the suspect in that case was followed down a "secluded alley," making it clear he was the object of officers' attention, positing that T.W. might instead have more reasonably thought that officers were "respond[ing] to suspected drug activity in the building or to citizen complaints." *Post* at 58. But the dissent again seems to freeze-frame this interaction at the moment officers parked their cars, and ignores the fact that, after parking their cars, two officers walked right at T.W.—the only person in the area—and began questioning him in a manner that made clear they suspected him of a crime. No reasonable person in T.W.'s shoes could doubt they were the object of the officers' suspicions (as T.W. was, in fact).

### 3. The Government's and Dissent's Authorities

Unlike T.W., the government does not have a principal case or two that it believes controls the analysis, and it instead relies on a smattering of cases for various principles. There is some merit to that approach, as we have frequently said

that "'case matching' is of limited utility" in deciding Fourth Amendment issues, where "[e]ach case turns on its particular facts." *Gomez v. United States*, 597 A.2d 884, 889 (D.C. 1991). That said, in this particular case, *Golden* provides strong support for the conclusion that T.W. was seized, and there is no countervailing authority that resembles this case.

To the extent the government has a lead case, it is *Brown v. United States*, 983 A.2d 1023 (D.C. 2009), a case that we distinguished in *Dozier* for reasons that are equally applicable here. *See Dozier*, 220 A.3d at 946 n.17. *Brown* involved two police officers on foot who approached a group of five to six individuals. 983 A.2d at 1025. One officer asked Brown if she had any guns or drugs on her, and when she did not answer, the officer repeated her question, at which point Brown handed her a bottle containing cocaine. *Id.* The show of force by the officers was considerably lower in *Brown* than what we have here; the officers in *Brown* were far outnumbered by the individuals in the group they approached, whereas T.W. was outnumbered six to one in this case. More to the point, Brown never denied having contraband on her even once, whereas T.W. did twice, and the officers in *Brown* never asked to search her (as they did here). In short, from the approach to the questioning, the coerciveness in this encounter was far greater than it was in *Brown*.

The same is true of *United States v. Drayton*, 536 U.S. 194 (2002), on which the government also relies. The officers in *Drayton* were in plainclothes when they boarded a crowded bus, and they engaged numerous passengers in conversation before reaching the defendants. *Id.* at 197-98. Those circumstances, unlike here, did not suggest that the defendants were the focus of an inquiry into criminal wrongdoing. As to their questioning, the officers never asked—and the defendants never denied—having contraband on them. Instead, an officer identified himself and then cut straight to asking for permission to search the defendants' bag, and then, their persons, and the defendants agreed. *Id.* at 198-99. As with *Brown*, the officers' conduct in *Drayton* was far less coercive both in how they approached the defendants and in how they questioned them.

The government also highlights *Burton v. United States*, 657 A.2d 741 (D.C. 1994), which resembles *Drayton*, in that several plainclothes police officers with their weapons concealed boarded a bus with the intent to interview its passengers, despite having no reason to think any particular passenger was engaged in criminal behavior. *Id.* at 742, 744. The officers spoke with a passenger before getting to Burton, evincing that he was not the focus of any police inquiry. *Id.* at 742. While the questioning of Burton is similar to what we have here—Burton denied having any drugs or guns on him before agreeing to a search—we gave no consideration to

that questioning in our seizure analysis, as it appears Burton himself attributed none to it. *Id.* at 744 ("Burton maintains that a seizure occurred . . . emphasizing" that the officers were situated as to "block[] the exit of the bus."); *see also Mills v. District of Columbia*, 259 A.3d 750, 758 (D.C. 2021) (opinions lack precedential value when "the judicial mind was not focused on the issue we now confront") (citation omitted). Instead, we focused on how the plainclothes officers approached Burton on a bus with other passengers, and "request[ed] permission to speak with [Burton] rather than demanding" he do so, unlike here, where there was no such request or affirmative indication that T.W. could decline to speak with the officers. *Burton*, 657 A.2d at 744. On the whole, T.W. was met with a substantially greater showing of police authority, focused exclusively on him, than was Burton.[10]

The dissent highlights *Kelly v. United States*, which bears no resemblance to this case in how officers approached the suspect; *Kelly* involved two officers on foot who approached an individual in a crowded train station and engaged in a fair bit of small talk before asking a single accusatory question. 580 A.2d 1282, 1284 (D.C.

---

[10] The government also relies upon *United States v. Gross*, 784 F.3d 784 (D.C. Cir. 2015), an opinion that is not binding on us and is readily distinguishable for the same reasons we articulated in *Golden*, 248 A.3d at 939-40. In sum, T.W. "was met with a significantly greater show of authority by the police" than was Gross, and Gross never denied having contraband on him before police asked to see his waistband. *Id.* at 940.

1990). *Kelly* stands for the proposition that an individual is not seized merely because he has been asked an accusatory question, and was then (after an initial denial) asked to consent to a search. *Id.* at 1284-86. We take no issue with that proposition. Like most Fourth Amendment inquiries, the surrounding circumstances matter. In this case, there is a strong argument that the manner in which police officers approached T.W. by itself—putting aside their questions—amounted to a seizure. T.W. froze and raised his hands in the air in response to the approach alone, which we have already opined was a natural response to the show of authority he faced. The same is not remotely true of *Kelly*. The circumstances in *Kelly* simply did not present any similar show of force accompanying the lone accusatory question.

More than relying on any particular case, though, the government and dissent stress that this encounter was brief and the officers were cordial during it. There is no disputing that, and we acknowledge that both factors provide at least some marginal support for finding no seizure. But those same factors were present in *Golden*, 248 A.3d at 932, and *Dozier*, 220 A.3d at 938, 946-47, and did not alter our conclusion that the subjects there had been seized. These factors thus provide no basis for us to depart from our holdings in those cases. Also, we again caution that courts should not "attach undue weight to a police officer's 'conversational' tone in

speaking to a suspect." *Golden*, 248 A.3d at 935 n.26; *see also Guadalupe v. United States*, 585 A.2d 1348, 1361 (D.C. 1991). While a harsh and commanding tone could certainly convey to a person that their compliance is non-optional, a polite and conversational tone does little to dispel coercion that arises from the content of officers' inquiries, or in how they have approached the suspect.

Finally, we note that our conclusion that T.W. was seized is heavily influenced by the body-worn camera footage. The video footage captures just how jarring the officers' approach was in this case in a way that we doubt a dry transcript would have conveyed. While we have at times stressed the brevity of police encounters as suggesting the lack of a seizure—typically in cases that predate the proliferation of body-worn cameras—here the footage demonstrates that the encounter was so abrupt and fast-moving that it would have been disorienting to any reasonable person in T.W.'s shoes. The officers did not announce themselves or their intentions, they did not greet T.W., nor did they stroll up to him in a casual manner. They instead jumped out of halting vehicles and came upon T.W. with a series of rapid-fire questions, each indicating they believed T.W. had a gun, as they closed in on him. That flashbang method of approaching and questioning a subject seems designed to produce temporary paralysis or flight; reasonable people would not think they are free to simply disengage and leave the area.

## C. Responses to the Dissent

Our principal responses to the dissent are above, as it has failed to distinguish *Golden* or *Dozier* in any meaningful way. We are bound by those precedents, so there is little more of import to say. Still, the dissent (1) offers some semantic critiques that are immaterial to the Fourth Amendment calculus, (2) offers some factual critiques that are unfounded, and (3) appeals to an anecdote about the "'skyrocketing' level of gun violence in our city," all of which we think warrant further response. We address those points in turn.

### 1. The Dissent's Semantic Critiques

The dissent begins with two semantic critiques, first positing that the officers pulled not into an "alley," but a "driveway." This is a quibble of no conceivable moment, but to be clear, the officers pulled off of a road onto a narrow stretch of asphalt, with several apartment buildings on one side and a partially fenced off and unimproved plot of land on the other, which dead-ends in a parking lot (presumably for use by the apartments' tenants and guests). We happen to think that is better described as an alley than a driveway, which typically connotes a short path for cars that leads up to a particular house or building. *See American Heritage Dictionary* at 564 (3d ed. 1992) (*driveway*: "A private road that connects a house, a garage, or

another building with the street"). "Driveway" also tends to conjure images of an even more confined space than an alley—we have never described the alley as narrow or "very narrow," as the dissent might be read to suggest—so we fail to see how our word choice is uncharitable to the government, as the dissent complains.

The dissent's second semantic critique is to take issue with us describing how officers "*followed* [T.W.] into that alley," despite the fact that they unquestionably did just that. The dissent's point seems to be that it would not have been obvious to T.W. that officers were following him, but once again—even assuming that were true[11]—that makes no difference to our Fourth Amendment analysis. Our obligation to draw reasonable inferences in the government's favor in this posture does not oblige us to omit undisputed facts.

---

[11] It does not follow from the fact that T.W. did not see the police vehicles in the street that he therefore would not have understood the officers had followed him, as the dissent posits. Without seeing the cars on the street, someone in T.W.'s shoes still might reasonably think that two vehicles hurriedly pulling into the alley mere seconds behind him and stopping on both sides of him, with nobody else around, had followed him there. But either way, we have placed no weight on this fact.

## 2. The Dissent's Factual Critiques

The dissent next offers two factual critiques. It asserts officers from the rear vehicle began approaching only "[s]everal seconds *after* the brief verbal exchange and *while Officer Gendelman was conducting the pat-down*." *Post* at 42. That is clearly contrary to the video evidence. Officer Ewing's body-worn camera footage shows that the rear passenger door of the second cruiser is open about five seconds before T.W. consents to a search, around when the questioning *begins*.[12] While the video then cuts away from the rear vehicle for a couple of seconds, so that it is impossible to pinpoint when the first officer exits the rear vehicle, the video cuts back to the rear vehicle just before T.W. consents to any search, and it shows one officer had completely exited the car and another at least had their door open. The events are close in time, to be sure, but the government is entitled only to reasonable inferences in its favor, not clearly wrong ones.

Next, the dissent insists that this was not a fast-moving encounter because the officers walked, but did not run or jump, from their vehicles after quickly pulling

---

[12] It is difficult to pinpoint, because the audio on the body-worn camera footage only picks up when the officer asks "You sure," but the rear passenger door of the second cruiser is open before that penultimate question.

them up to T.W.'s position and immediately exiting. On this point the dissent ignores the fact that the officers hurriedly pulled their vehicles right up to T.W., so that by the time Ewing exited his vehicle, he had no need to run. He was already upon T.W., and he could not have taken more than a stride if he had attempted to run toward him. And when one refers to jumping out of a vehicle, they typically mean getting out quickly—which the officers indisputably did here—not literally jumping out of it (which is quite tough to do from a seated position in a sedan). So we again believe our description is perfectly apt, though we acknowledge the officers did not spring forth from their vehicles as one might expect a cat to do.

### 3. The Dissent's "Addendum"

The dissent closes with an "addendum." It begins with a single cherry-picked statistic and adds an anecdote about an overheard but unidentified "press report" to suggest that there is a "'skyrocketing' level of gun violence in our city," as if to insinuate the Fourth Amendment's protections should ebb when crime rates rise. If one actually adhered to that doctrinal view—we do not—then one might expect them to be far more rigorous in their statistical approach than the dissent is. For instance, because T.W. was stopped in 2018, the dissent should explain why its statistical approach is not indexed to 2018, when violent crime in the District was the lowest

it had been in decades.[13]  And perhaps the dissent can also explain why, in the previous decades of waning violent crime in the District, our court has never looked to crime rate data to justify more robust Fourth Amendment protections than we recognized in, say, 1990, when we decided the dissent's principal authority (*Kelly*) and the violent crime rate was considerably higher by every measure than it is today.

More to the point, the dissent's closing has no place in a judicial opinion where the only question is whether T.W. was seized under the Fourth Amendment. "If high crime rates were grounds enough for disposing of Fourth Amendment protections, the Amendment long ago would have become a dead letter." *Samson v. California*, 547 U.S. 843, 865 n.6 (2006) (Stevens, J., dissenting).  Moreover, we generally leave policy judgments for the legislature, and the D.C. Council has passed temporary legislation, with permanent legislation pending congressional review, precluding consent searches under circumstances like those presented here.  *See* Comprehensive Policing and Justice Reform Amendment Act of 2021, Subtitle F, "Limitations on Consent Searches," D.C. Act 24-781, 70 D.C. Reg. 953 (transmitted

---

[13] *See District of Columbia: Trend of Violent Crime from 1985 to 2021*, FBI Crime Data Explorer, https://cde.ucr.cjis.gov/; https://perma.cc/EQE5-D6WW (last visited Apr. 5, 2023) (providing data on violent crimes in the District from 1985 to 2020, and showing D.C.'s violent crime rate in 2018 as the lowest over that 36-year span; in every year from 2017 to 2020 the violent crime rate was lower in the District than at any point between 1985 and 2016).

to Congress Jan. 26, 2023). That legislation requires officers to inform subjects that they have "a legal right to decline to consent to the search," and that a "search will not be conducted if the subject refuses to provide consent." *Id.* (adding D.C. Code § 23-526). While that legislation post-dated the stop here, and so does not inform our decision, we note the Council's current judgment that people who are confronted by police in the community and asked to submit to a search need to be reminded of their rights in the stress of the moment.

\* \* \*

Considering the number of officers who approached T.W., the manner in which they approached him, and their persistent accusatory questioning despite T.W.'s repeated denials that he had a gun, we conclude that T.W. was seized in violation of his Fourth Amendment rights. We reverse his convictions.

*So ordered.*

THOMPSON, *Senior Judge*, dissenting: After appellant T.W. consented to a pat-down by police officers, the officers recovered from his waistband a gun that contained twenty-nine rounds of ammunition (one in its chamber) and a magazine — a large capacity ammunition feeding device — that had a capacity of thirty-one

rounds. The trial court found him guilty of multiple weapons offenses after denying his motion to suppress the gun and ammunition. Appellant now seeks a reversal of his convictions, claiming that he was unconstitutionally seized prior to the search, that his consent was involuntarily given, and that in any event his consent was only to a pat-down, not to the subsequent shirt-lifting search that enabled officers to see the gun and magazine.

My colleagues in the majority today grant appellant the relief he seeks, emphasizing that their conclusion that he was seized prior to his consent to a pat-down is "heavily influenced by the [officers'] body-worn camera [BWC] footage," and agreeing with appellant that he was seized when the officers, who had asked appellant whether he had a gun, did not take his negative response at face value and subsequently asked him whether he was sure and whether he would consent to a pat-down. For the reasons that follow, I dissent from the holding that appellant was unlawfully seized.

**I.**

I will begin my analysis by briefly summarizing the well-established legal principles that must guide our analysis. I then briefly recount the facts, adhering to our obligation to view "the facts and all reasonable inferences therefrom . . . in favor

of sustaining the trial court ruling." *Peay v. United States*, 597 A.2d 1318, 1320 (D.C. 1991) (en banc).[1] Along the way, I shall point out how, by contrast, my colleagues repeatedly have presented the facts and drawn inferences in a light favorable to finding a Fourth Amendment violation (and, as I shall also show, in a light favorable to likening the circumstances in this case to those of recent cases in which this court has found unlawful seizures).

The Fourth Amendment's protections against "unreasonable searches and seizures" are triggered when a person is seized by the police, either during an investigative detention or an arrest. U.S. Const. amend. IV; *Dozier v. United States*, 220 A.3d 933, 939 (D.C. 2019). A seizure must be supported by a certain level of suspicion, prior to initiation, that criminal activity has occurred — i.e., by reasonable, articulable suspicion for an investigative detention, and by probable cause for an arrest. *Id.* In this case, no one contends that there was reasonable, articulable suspicion to justify an investigative detention of appellant prior to the officers' encounter with appellant or prior to the verbal exchange between the officers and appellant that preceded the pat-down.

---

[1] *See also Brooks v. United States*, 367 A.2d 1297, 1304 (D.C. 1976) ("[W]e are to determine if the denial of the motion to suppress is supportable under any reasonable view of the evidence.").

There has been a seizure if, under the totality of the circumstances, "the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 940 (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)). "The hypothetical reasonable person is an innocent person." *Id.* "The question is 'not what the defendant himself . . . thought, but what a reasonable [individual], innocent of any crime, would have thought had [they] been in the defendant's shoes.'" *Golden v. United States*, 248 A.3d 925, 934 (D.C. 2021) (alterations in original) (quoting *United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007)).

Police may effectuate a seizure of a person without use of physical force through a "show of authority" to which the defendant submits, generally through compliance with the officers' orders or requests (such as by staying in place rather than continuing on his or her way). *Id.* at 935; *see also id.* at 934, 936 (concluding that a seizure occurred "once Officer Vaillancourt began asking Mr. Golden to expose his waistband to enable the officer to confirm that he was not carrying a gun there," not when "four police officers suddenly drove up and stationed their unmarked SUVs perpendicular to each other, in front of him (blocking his path) and to his left as he walked down the street alone at night"). But we have rejected the notion that "a Fourth Amendment seizure takes place any time a person would feel

some pressure to respond to an officer's questions and requests." *Dozier*, 220 A.3d at 943; *see also id.* at 947 (reasoning that "[n]o single circumstance in this case [including the fact that a police vehicle carrying four uniformed and armed officers drove into an alley after Mr. Dozier] was by itself sufficient. . . to amount to a seizure," and concluding that Mr. Dozier was seized "by the time he complied with the officers' request to put his hands on the alley wall so that they could pat him down"). Further, staying in place may not amount to compliance if the person has another reason for staying put. *Bostick*, 501 U.S. at 436 ("[T]he mere fact that Bostick did not feel free to leave the bus does not mean that the police seized him. Bostick was a passenger on a bus that was scheduled to depart. He would not have felt free to leave the bus even if the police had not been present."). Moreover, that "police officers are inherently figures of authority" does not necessarily mean "that their presence results in non-consensual encounters." *Kelly v. United States*, 580 A.2d 1282, 1285 (D.C. 1990).

A police officer does not manifest a show of authority "by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion). But such an encounter may evolve into a seizure "if the police 'convey a message that

compliance with their requests is required'" or that they "will not allow the suspect to terminate the inquiry and depart before satisfying the officers' concerns." *Golden*, 248 A.3d at 935-36 (quoting *Bostick*, 501 U.S. at 435). Such a message may be conveyed by "repeated or insistent (and implicitly accusatory) questions or requests designed to ferret out whether someone stopped on the street is in possession of weapons or contraband, particularly in conjunction with other intimidating or coercive circumstances." *Id.* at 935; *see also id.* at 936 n.27 (citing cases where police were determined to have seized a person through repeated and insistent questioning). We have explained, however, that implicitly accusatory questioning, the presence of multiple police officers, the occurrence of the encounter in a location that is secluded or out of public sight, and the fact that a person is by himself do not "without more" render an encounter a seizure; rather, such factors "provide important context" for any additional circumstances present in the interaction that "materially increase[] its coerciveness." *Jones v. United States*, 154 A.3d 591, 596 (D.C. 2017).[2] We recognize that "the Fourth Amendment calculus tolerates a measure of official pressure in exchange for needed cooperation from the public with

---

[2] One of the additional factors in *Jones* that increased the coerciveness of the encounter was that the officer asked his partner to perform a warrant check that was still underway when the officer asked to inspect the cigarette box Jones was holding. *Jones*, 154 A.3d at 596-97; *see also Dozier*, 220 A.3d at 942 (noting that a warrant check "would send a strong signal to a reasonable innocent person that his liberty would be restrained while the check was in progress").

police activities in safeguarding safety and assisting with law enforcement." *Dozier*, 220 A.3d at 943.

## II.

At the suppression hearing, Officer Dmitry Gendelman testified that on March 3, 2018, at approximately 5:31 p.m., he and other uniformed members of the Metropolitan Police Department ("MPD") "Crime Suppression Team" were on patrol and noticed appellant outside an apartment building at 2348 Ainger Place, S.E. The BWC footage from cameras worn by Officer Gendelman and Officer Ewing shows that the encounter occurred during daylight. Officer Gendelman testified that he and his partners observed appellant walk toward the sidewalk, look out at the driveway as the officers approached, and then "abrupt[ly]" pivot and walk back toward the direction from which he had come. Officer Gendelman considered this to be suspicious or "elusive" behavior that warranted investigation, but he acknowledged that he did not see any bulge in appellant's clothing and that appellant was walking normally and did not "blad[e]" his body away from the officers.

The BWC footage shows a "driveway," perpendicular to Ainger Place, running parallel to the building, and the BWC footage shows that a series of bollards separate the driveway from a grassy walkway that runs alongside the 2348 building,

along both sides of the building entrance. The police vehicle in which Officer Gendelman and Officer Ewing were riding turned into the driveway, with the officers losing sight of appellant for a while but eventually pulling up in front of him, where he was standing at the building entrance. By the time the police vehicle stopped, appellant was walking toward the officers' vehicle with his hands up (having, as the videos show, removed them from his pockets). The officers had not asked appellant to put his hands in the air.[3] Officers Gendelman and Ewing exited their vehicle and approached appellant. Officer Gendelman testified that he was "mindful . . . not to block" or encircle appellant, so he repositioned himself to be on the same side of appellant as Officer Ewing. Officer Gendelman testified that the officers stood about three to five feet away from appellant.

Officers Gendelman and Ewing spoke to appellant in a "[c]ordial," conversational tone, interacting with him for a total of "[l]ess than 30 seconds." Officer Ewing spoke first, asking appellant whether he had a gun on him. Appellant responded that he did not. Officer Ewing then asked appellant, "You sure?" to which appellant responded, "Yeah, I'm positive." Officer Gendelman then asked whether

---

[3] The trial court (the Honorable Todd Edelman) found that appellant raised his hands "before anything had been said to him at all."

he could pat appellant down, "just to make sure." Appellant replied, "Yeah," and (without being directed to do so) held his arms out. Officer Gendelman replied, "My man," and proceeded to pat appellant down.[4] Officer Gendelman testified that he felt, through appellant's jacket and under his waistband, a "hard, rectangular object inconsistent with the human anatomy that [he] recognized to be a magazine for a handgun." He then lifted appellant's jacket and saw a handgun magazine "protruding" from appellant's underwear. When the officers then put appellant's hands behind his back to handcuff him, appellant remarked, "You got me, you got me, you got me." The entire encounter up to this point had lasted only a few seconds.

While the above-described encounter was going on, a second and third police car, which had been patrolling together with the first vehicle and which each carried multiple officers, pulled in behind the first police vehicle, about fifteen feet away from appellant. Several seconds *after* the brief verbal exchange between appellant and the first two officers, and *while Officer Gendelman was conducting the pat-down* described above, other officers from the second and third vehicles began walking toward the area where appellant and Officers Ewing and Gendelman were standing.

---

[4] According to the online Free Dictionary, "my man" is "[a]n exclamation of appreciation . . . ." *My Man*, THE FREE DICTIONARY, https://idioms.thefree dictionary.com/my+man; https://perma.cc/8XV4-MUNY (last visited April 7, 2023).

Appellant, who was twenty-one years old at the time of the incident, testified that he was outside the apartment building, where he had been visiting his aunt, while he waited for his ride to arrive. He testified that he had not seen the police when he turned and walked back toward the building, but first saw the police when a caravan of at least three marked police cars "swarmed" him. He testified that officers emerged from the vehicles asking, "Where the guns at?"[5] and that he put his hands up and then consented to a pat-down because he was scared and nervous, never having been arrested before. Appellant testified that he had, however, been stopped by police before, "[j]ust walking randomly in life before. Growing up."

Appellant acknowledged that the officers did not "physically put hands on" him before the pat-down. He testified first that he "wanted to walk away" but "didn't feel like [he] could," but subsequently testified that he "wanted to walk, but [he] didn't know if [he could] or not." He acknowledged that he had room to walk past the police cars and that no officer pulled out a gun.

---

[5] Judge Edelman found that the officers' first question was "essentially do you have a gun," not the accusatory question ("where the guns at?") to which appellant testified. The first question is not audible on either of the BWC videos, but the officers' follow-up question, "You sure" seems to confirm Officer Gendelman's testimony that appellant gave a "no" (or other negative) response to the first question (rather than a response such as "what guns?" which might have followed the accusatory question appellant described).

My colleagues in the majority identify a number of factors that they say contribute to a conclusion that appellant was seized before he consented to a pat-down. But, as the following multiple examples demonstrate, their conclusion improperly rests on a view of "the facts and all reasonable inferences therefrom" in a light that favors finding a Fourth Amendment violation, rather than on a view "in favor of sustaining the trial court ruling." *Shelton v. United States*, 929 A.2d 420, 423 (D.C. 2007).

To begin, my colleagues say that the officers "quickly pulled into an alley after [appellant]." *Ante* at 10. I acknowledge that during his testimony appellant referred to the driveway where the officers' vehicles parked as an "alley," but, as appellant's trial counsel acknowledged in his suppression-motion argument, an "alley" is "bordered by buildings."[6] The area involved here was the driveway to the front door of the 2348 building, and across from it was not another building or buildings, but an open grassy area; as Judge Edelman observed, the encounter occurred in a "large open space." This is more than semantics: there was no "very narrow alley" in this incident as there was in *Jones*, *see* 154 A.3d at 596 (quotation

---

[6] According to the online Free Dictionary, an "alley" is "a narrow lane or passage, esp. one between or behind buildings." THE FREE DICTIONARY, https://www.thefreedictionary.com/alley; https://perma.cc/2JJX-A485 (last visited April 7, 2023).

marks omitted); and while appellant was by himself in front of the apartment building, he was not in a "secluded alley . . . enclosed on both sides by brick walls, [into which] no passersby could see . . . unless they were right at the entrance of one end or the other," *Dozier*, 220 A.3d at 942.

My colleagues further say that the officers "*followed* [appellant] into an alley" (emphasis added). *Ante* at 11. However, appellant testified that he did not even see the police until they pulled up in front of the building, and thus he did not perceive that he was being "followed."[7]  As Judge Edelman aptly remarked: "[A]s [T.W.] himself acknowledged, it didn't seem like they were following him and couldn't have, because he didn't even notice the police cars when they first saw him," such that it was not "accurate to say that the officers followed [appellant] in any way that's meaningful in this context."  For all that a reasonable, innocent person in appellant's position would have perceived, the officers could have been pulling up to look for someone inside the apartment building, rather than targeting that reasonable person.  An onlooker would have perceived no "clear purpose to confront" appellant, *ante* at 11, just because the police pulled up to a building

---

[7] Appellant apparently did not walk back toward the building entrance by walking along the driveway — elsewise the officers would not have lost sight of him.

entrance in front of which he was standing. If appellant removed his hands from his pockets and raised his hands because he thought the officers' arrival was directed at him, the reasonable inference on the factual record is not that he did so because he believed he had been "followed." A reasonable inference is that he did so because of his consciousness of guilt (of having an unlawful, high-capacity firearm in his waistband), or that he did so because, as an African-American man, he had learned the importance of allowing his hands to be seen when police officers approach.[8] Whichever is the more reasonable inference, "the character of [appellant's] response should not govern the constitutionality of the officer[s'] conduct."[9]

---

[8] As we noted in *Dozier*, "[f]or generations, black and brown parents have given their children 'the talk' — instructing them . . . to . . . always keep your hands where they can be seen . . . out of fear of how an officer with a gun will react to them." *Id.* at 944 n.15 (quoting *Utah v. Strieff*, 579 U.S. 232, 254 (2016) (Sotomayor, J., dissenting) (internal citations omitted)).

My colleagues opine that appellant's immediate reaction to the officers' approach — raising his hands in the air — was a "natural response" to the officers' "show of authority," *ante* at 11 (which by that time had consisted solely of the police vehicle pulling up to the front door of the apartment building and stopping). But, again, appellant's reaction of taking his hands out of his pockets and raising his arms may have had more to do with fear of some police officers' aggressive and violent conduct toward African-American men than with a "show of authority."

[9] *California v. Hodari D.*, 499 U.S. 621, 645 (1991) (Stevens, J., dissenting).

My colleagues go on to say that the officers "positioned their vehicles in a manner that boxed [appellant] in, cutting off his two most obvious escape paths and signaling that he was not free to leave." *Ante* at 10. They say that "the trailing vehicle parked behind [appellant], so that the officers had him pinned in" and that "[t]he officers in the front vehicle then approached [appellant] quickly from both sides in a pincer maneuver, with one approaching from his right and the other circling around the back of the vehicle to approach [appellant] from his left." *Ante* at 18. (My colleagues take pains to say that Officer Gendelman "circl[ed] around the back of the vehicle to approach [appellant] from his left," *ante* at 18, but that would have been the closest approach route for the officer, who had been seated on the back driver's side of the vehicle. But again, rather than show any "pin[ning] in," the BWC footage shows a grassy pedestrian pathway parallel to the apartment building that ran along both sides of the building entrance and that was separated from the driveway by a long line of bollards. (To say, as my colleagues do, that the visibly well-trodden pathway is not a "walkway in any ordinary sense," *ante* at 20, is another good example of their failure to view the evidence in a light favorable to sustaining the trial court's suppression ruling.) The videos show clearly that the pedestrian pathway was unblocked and available to appellant (as was the unlocked

building front door).[10] Moreover, my colleagues' "boxed in" and "pincer maneuver" characterizations entirely neglect the testimony that Officer Gendelman, the second officer to approach appellant, was careful to reposition himself so that both officers were standing on the same side of appellant. Further, to the extent the police vehicle cut off appellant's path forward, it is noteworthy that the path forward led to an open grassy area, not to the street where appellant might have caught his ride. In short, appellant was not boxed in, and the evidence does not support an inference that appellant would have reasonably understood the officers to be blocking his exits.

My colleagues describe the encounter between appellant and the officers as "abrupt and fast-moving" after the officers "jumped out" of their vehicles, *ante* at 28, but the BWC footage shows none of that. The Gendelman video shows Officer Ewing walking at a normal pace (if not slowly) toward appellant as he exits the front passenger seat of the vehicle. Similarly, the Ewing video shows Officer Gendelman moving at the same pace as he walks around the back of the vehicle toward appellant. The Ewing video also shows Officer Ewing opening the front passenger door as soon

---

[10] My colleagues concede that appellant "might have gone inside the apartment building, *presuming the door was unlocked*." *Ante* at 18 (emphasis added)] But appellant testified that the door *was* unlocked.

as the vehicle comes to a stop, but it does not show the officer moving abruptly out of the vehicle.[11] The BWC footage shows appellant standing calmly and conversing calmly with the officers (Officer: "I appreciate you not fighting." Appellant: "I'm not."); appellant does not appear to be scared or nervous.

My colleagues further say that "four officers were approaching T.W. before T.W. agreed to be searched." *Ante* at 10. That assertion is quite a stretch. The Ewing video shows that appellant gave his consent *before* any of the additional officers lessened the distance between where their vehicles were parked and where appellant was standing. (The videos do not capture whether a third officer might have exited the driver side of the second vehicle before appellant gave his consent, but we have the testimony of Officer Gendelman that "when I'm patting him, [the additional officers] might be just like stepping out of their vehicle coming towards. So maybe they're 15 -- approximately 15 feet away" and his estimate that "at the time that I'm patting [T.W.], they would have been even further back. Maybe 15, 20 feet.") In other words, before appellant was "swarmed," Officers Ewing and Gendelman had already obtained his consent to a pat-down.

---

[11] Moreover, a portion of the early part of the Ewing video shows only the door of the apartment building, and thus does not show that the officers' movements were so abrupt as to be disorienting.

Focusing on the officers' questions, my colleagues say that the officers asked appellant "only accusatory questions," conveying that they believed he had a gun on him. *Ante* at 10. But the questions "do you have a gun?" and "you sure?" are not accusatory. *Cf. United States v. Gross*, 784 F.3d 784, 788 (D.C. Cir. 2015) (remarking that an officer's question, "Do you have a gun?", "did not accuse Gross of possessing a gun or committing a crime").[12] But even accusatory questioning in the face of an initial denial does not necessarily amount to a seizure, *see Kelly v. United States*, 580 A.2d 1282, 1284-86 (D.C. 1990), and I have already shown why there was nothing about the other circumstances on which my colleagues rely — the manner in which the officers approached appellant and his raising his hands in the air in response to their approach — to support a conclusion that appellant was seized before he permitted the pat-down.

My colleagues also say that the officers' asking whether they could do a pat-down "just to make sure" "manifest[ed] their disbelief in [appellant,] and

---

[12] The context is quite different, but it occurs to me that the questions themselves are no more accusatory than Transportation Security Administration agents' repeated questions about whether passengers passing through security checkpoints have bottles of water: the questions are designed to focus attention and to counter the tendency to give unthinking, negative responses (in my experience, frequently given by passengers who, much to their chagrin, are found upon screening to have forbidden bottles of water in their carry-on bags).

suggest[ed] they were not going to let him walk away unless he could alleviate those suspicions." *Ante* at 10. But that is to look at the evidence in the light most favorable to finding a seizure. I believe that viewing the evidence in a light favorable to sustaining the trial court's ruling requires a recognition that a crime suppression team sets out "proactive[ly]" to recover guns everywhere they *might* find them; the officers do not necessarily believe that everyone they question will have a gun, and the record here gives us no reason to think that a reasonable innocent person in appellant's position would have thought otherwise. In the same vein, Officer Ewing's "my man" remark, see *supra* note 4, afforded appellant a reason to understand that the officers had sought his voluntary cooperation (and that he could therefore withdraw his consent before the pat-down occurred).

In denying the motion to suppress, Judge Edelman found that the officers' tones during the encounter were "conversational if not cordial" and that the officers did not jump out in a particularly aggressive way. Citing the factors set out in *United States v. Mendenhall*,[13] Judge Edelman reasoned that the portion of the encounter

---

[13] 446 U.S. 544, 554 (1980) (opinion of Stewart, J.) ("Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.").

prior to the search was not a seizure because it was "quite brief" — as my colleagues acknowledge, the encounter lasted about ten seconds from when the first officers exited their vehicle to when the pat-down search began, *ante* at 4; and because the presence of the two officers was "minimally threatening," "[w]eapons were not displayed or touched," appellant was not touched, there were no sirens or flashing lights, no commands were given, and the encounter occurred "in an open area on a public street and sidewalk in front of the building" where appellant "had ample space to walk away or back into the building."[14]  Adding to those factors, I believe it is helpful to juxtapose appellant's acknowledgment that he "didn't know" if he could walk away or not against the principle that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person *would have believed that he was not free to leave*." *Mendenhall*, 446 U.S. at 554 (emphasis added) (opinion of Stewart, J.).  Appellant's uncertainty — experienced while he knowingly and unlawfully had a high-capacity loaded firearm in his waistband — gives us no reason to think that a reasonable *innocent* person in appellant's position would have believed he was not free to leave and to ignore or refuse the officers' requests.

---

[14] "For many of the same reasons," the court did not find that the consent to the search was coerced.

Viewed in a light favorable to sustaining the trial court's ruling instead of in a light favorable to finding a Fourth Amendment violation, the evidence and reasonable inferences therefrom amply support Judge Edelman's denial of the suppression motion. Our review, however, is de novo, *Dozier*, 220 A.3d at 940, and my colleagues assert that *Golden* "compels" us to hold that there was a seizure in those ten seconds or less before the officers asked for and obtained appellant's consent to a pat-down, *ante* at 14, and that *Dozier* likewise "counsels in favor of concluding that [appellant] was seized." *Ante* at 21. Not so.[15]

Mr. Golden was walking down a public street at night when two unmarked cars carrying four members of the MPD Gun Recovery Unit drove past him, heading in the same direction in which he was walking. *See* 248 A.3d at 931. As Mr. Golden approached an intersection, one of the police cars turned the corner and stopped directly in front of him while the other car stopped just before the intersection, perpendicular to the first car, partially surrounding (and clearly targeting) Mr. Golden, blocking his path, and keeping him from continuing along the way toward

---

[15] Indeed, it would be surprising if either case compelled an identical ruling here. As the Supreme Court observed in *Terry v. Ohio*, 392 U.S. 1 (1968), "[s]treet encounters between citizens and police officers are incredibly rich in diversity," *id.* at 13. Thus, it should be rare that the result of one Fourth Amendment case will dictate the result in another.

wherever he had been going. *Id.* at 931, 936.[16] The officers remained inside the

vehicles (with their windows down), but one of the officers asked Mr. Golden "in a

conversational tone" whether he was carrying any weapons. *Id.* at 932. Mr. Golden

replied that he was not. *Id.* The officer then asked, "[C]an you just show me your

waistband[?]" *Id.* (alterations in original). Mr. Golden, who was wearing a shirt

with a sweatshirt tied around his waist, lifted up one side of his shirt in response. *Id.*

---

[16] *Cf. Jones*, 154 A.3d at 595-98 (declining to hold that an officer's repeated questioning of Jones, which would have conveyed to a reasonable person that the officer suspected him of something, rendered the encounter a seizure; concluding, however, that additional circumstances compelled the conclusion that there was a seizure, including that the officer "effectively hemmed [Jones] in" after stopping the police cruiser in a very narrow alley, thus "substantially reduc[ing] the ease with which [he] could have walked on or otherwise avoided the encounter"); *In re J.F.*, 19 A.3d 304, 309 (D.C. 2011) (concluding, given the totality of the circumstances, which included an officer's order that J.F. remove his hands from his pockets and the officers' continued holding of J.F.'s companion even after no contraband was found on his person, that there was a seizure prior to the officer's request for consent to search J.F. because "the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business"); *Jackson v. United States*, 805 A.2d 979, 988 (D.C. 2002) (reasoning that when Jackson "was asked to turn around (apparently in preparation for a frisk), and the officer touched Jackson's jacket, the police crossed the critical line between consent and coercion" (internal quotation marks omitted)); *Hawkins v. United States*, 663 A.2d 1221, 1224-26 (D.C. 1995) (concluding that a seizure occurred where officers approached Hawkins while he was in his car (which was double-parked and had its engine running), asked him to park and turn off his ignition, positioned themselves beside his driver's side door and at the front passenger door, and then asked him three times whether he was "packing"; reasoning that the officers "adopted a posture displaying their authority which communicated very clearly to appellant that he was not free to simply ignore them and leave").

The officer stated that he could not see Mr. Golden's waistband because of the sweatshirt. *Id.* Mr. Golden then removed the sweatshirt from his waist and held it out. *Id.* The officer exited the vehicle at that point, again stating that he was unable to see Mr. Golden's waistband because the sweatshirt was blocking his view of it. *Id.* The officer asked Mr. Golden, "What do you have?" *Id.* When Mr. Golden did not respond verbally, the officer frisked him and found a weapon. *Id.*

In analyzing the seizure issue in *Golden*, we observed that notwithstanding the "impressive show of police authority" — "four police officers in two unmarked vehicles" showing up and pointedly blocking Mr. Golden's path — a seizure of Mr. Golden had *not* occurred at the point when the police asked whether he had any weapons on him. *Id.* at 936-37. We said that what happened next, however, "took the encounter beyond mere questioning." *Id.* at 937. We concluded that it was at the moment when the officer asked Mr. Golden to show his waist that a seizure occurred. *Id.* at 937-38.

The facts here are non-analogous in significant ways. The officers, who parked their vehicles at the building entrance, did not block the route appellant was walking or park their vehicles in a way that would have conveyed to a reasonable innocent person that he was a target of investigation. Appellant did remain standing

on the sidewalk during the encounter rather than walk away or into the building, but he had a reason to do so — he was waiting for his ride — that had nothing to do with the officers' questions. *Cf. Bostick*, 501 U.S. at 436 ("Bostick's movements were 'confined' in a sense, but this was the natural result of his decision to take the bus [that was scheduled to depart]; it says nothing about whether or not the police conduct at issue was coercive."). Further, as noted earlier, the bollards that separated the grassy walkway that ran alongside the apartment building from the driveway in which the line of police vehicles was parked left appellant with an unobstructed path of egress. Like in *Golden*, the officers did ask appellant whether he had a gun, and they did not take his initial "no" answer at face value; but what they followed up with was another question ("You sure?") and a request to consent to a pat-down, rather than, as with Mr. Golden, what amounted to repeated commands that he rearrange his clothing to prove he had no contraband.

In *Dozier*, the officers were part of a "high visibility" foot patrol team that focused on solicitation of prostitution and drug activity. *Dozier*, 220 A.3d at 937. We reasoned from that circumstance that Mr. Dozier (who ran from police after a pat-down revealed a "bulge" — which turned out to be a bag of cocaine — in his sock) had reason to believe that the officers who followed him down a "secluded alley" suspected him of drug activity. *Id.* at 938, 942. We noted that Mr. Dozier

had first ignored the officers' questions and continued walking away, *id.* at 938, but that the officers persisted in asking to speak with him and that when he agreed to speak with them, asked whether Mr. Dozier had illegal weapons on him. *Id.* Mr. Dozier responded, "no" but then lifted his jacket to show that he was not armed. *Id.* Despite Mr. Dozier's "two responses to the officers' questions," the officers asked Dozier "whether he could be patted down for any weapons," and then requested that he "place his hands on the [alley] wall." *Id.* at 938, 946 (alteration in original) (internal quotation marks omitted). We noted the officers' "repeated questioning and escalating requests" and the setting of a "secluded alley partially blocked by a police cruiser[.]" *Id.* at 941. But regarding when a seizure occurred, we held that Mr. Dozier "was seized within the meaning of the Fourth Amendment by the time he complied with the officers' request to put his hands on the alley wall so that they could pat him down." *Id.* at 947.

The evidence here is not analogous. Officer Gendelman testified that his unit had an "expansive role" in patrolling, not only looking for indications that people were armed or selling drugs but also responding to citizen complaints about matters such as loitering and gambling. To the extent that appellant's perception was not affected by his consciousness of guilt of possessing an illegal, loaded high-capacity firearm, the circumstances would have made it seem just as likely that the officers

were arriving at the front of the 2348 building to respond to suspected drug activity in the building or to citizen complaints about other criminal activity, as that the officers suspected appellant of having a firearm; or just as likely that the officers' arrival signaled another "random[]" encounter of the type appellant had experienced before.[17]  Moreover, appellant, who readily spoke with the officers and had never tried to ignore them and walk away, was not in a secluded alley, and, during the entirety of the few-seconds encounter, the officers never gave him a command to do anything with his body.

Nor do our other precedents require us to hold in the instant case that there was a seizure prior to the consensual pat-down.  Our opinion in *Kelly* is instructive. There, a detective asked whether he could speak with Kelly and then asked Kelly whether he had any drugs in the shopping bag he was carrying.  580 A.2d at 1284.

---

[17] Although appellant testified that he was "swarmed" by police vehicles, "the presence of multiple officers wearing police gear, including guns and handcuffs, does not automatically mean that a stop has occurred," and "the act of approaching a person in a police car does not constitute a seizure where the officers do not use their siren or flashers, do not command the person to stop, do not display their weapons, and do not drive aggressively to block or control the person's movement." *Gross*, 784 F.3d at 787-88 (cleaned up).  Further, even if a reasonable person would have understood the officers' question to appellant about whether he had a gun to mean that the officers "had singled [appellant] out and partially surrounded him because they suspected *him* of being armed and committing a crime at that very moment," *Golden*, 248 A.3d at 937, we concluded in *Golden* that the same question by itself did not amount to a seizure.  *Id.* at 937-38.

Kelly said, "no." *Id.* The detective then asked whether Kelly would have a problem if the detective searched the shopping bag, and Kelly said "no." *Id.* When the detective looked inside the bag, he found a zip-lock bag containing a white substance that turned out to be cocaine. *Id.* We concluded that the detective "did nothing which would lead a reasonable person to believe that a seizure had taken place." *Id.* at 1286; *cf. United States v. Drayton*, 536 U.S. 194, 198-200 (2002) (holding that no seizure had taken place when multiple officers boarded a bus, announced that they were looking for drugs and illegal weapons, asked to search petitioner's bag in the overhead luggage rack, and when they found no contraband in the bag, asked, "Do you mind if I check your person?", obtained consent, and found illegal drugs).

For all the foregoing reasons, I would uphold the trial court's ruling that appellant was not unlawfully seized.[18]

An addendum: According to statistics published on the Metropolitan Police Department website, as of March 30, 2023, the number of homicides in the District

---

[18] Further, because I also am not persuaded by appellant's argument that his consent to the pat-down was involuntary or by his argument that the officers lacked probable cause to lift his shirt after conducting the pat-down, I would affirm appellant's convictions.

of Columbia in 2023 is up 31% from the same time last year.[19]  As I finished writing a draft of my dissenting opinion, I had just heard a press report about the "skyrocketing" level of gun violence in our city.  Not only do we have a long-recognized obligation to view "the facts and all reasonable inferences therefrom . . . in favor of sustaining the trial court ruling" denying a suppression motion, *Peay*, 597 A.2d at 1320, but our community's interest in safety and effective law enforcement is not well served by an approach to appellate review that favors finding an unlawful seizure when officers, in a seconds-long exchange, politely ask a citizen whether he has a gun on him and follow up by asking "you sure?" and seeing whether the citizen will agree to a pat-down if he gives a "no" response.  That approach, I am afraid, "may exact a high toll in human injury." *Terry v. Ohio*, 392 U.S. 1, 15 (1968).  This is not at all to attempt to justify seizures that violate the Fourth Amendment according to the crime rate, but to recognize that "characterizing every street encounter between a citizen and the police as a 'seizure' . . . would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices,"

---

[19] *See 2023 Year-to-Date Crime Comparison*, METRO. POLICE DEP'T https://mpdc.dc.gov/page/district-crime-data-glance; https://perma.cc/FQ6J-EDMG (last visited April 7, 2023).

with the result that "the security of all would be diminished." *Mendenhall*, 446 U.S.

at 554 (opinion of Stewart, J.).[20]

---

[20] My colleagues imply that the current crime statistic I have cited is irrelevant to a discussion of appellant's five-year old crime. *Ante* at 32-33. They know very well, however, that the effect of the court's opinion will be felt now, as police officers presumably will be deterred from engaging in the type of investigatory exchange involved in this case. My colleagues are quite correct that I have not attempted a rigorous statistical analysis of the crime data, but my response is that "we need not ignore the data which do exist simply because further refinement would be even more helpful." *Maryland v. Wilson*, 519 U.S. 408, 413 n.2 (1997). In any event, I don't think any of us doubts that our community is plagued by gun violence. And while we as judges must faithfully apply the Constitution and eschew making policy decisions that are reserved to the legislature, my addendum is in good company — Justice Stewart's opinion in *Mendenhall*, for one — in not turning a blind eye to what is occurring around us and the needs of law enforcement.